## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

**ANA M. RENTAS-CRUZ**,

    Plaintiff,

    v.                                                                      Civil No. 15-1782 (BJM)

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

## OPINION AND ORDER

Ana M. Rentas-Cruz ("Rentas") seeks review of the Commissioner's determination that she is not disabled or entitled to benefits under the Social Security Act ("Act"), 42 U.S.C. § 423, as amended. (Docket No. 1). Rentas filed a memorandum of law supporting her position and asks for judgment to be reversed and an order awarding disability benefits. (Docket No. 15, "Pltf. Memo."). The Commissioner answered the complaint and filed a memorandum of law in support of her position. (Docket Nos. 11, 20; "Deft. Memo."). This case is before me by consent of the parties. (Docket Nos. 9, 12-13). After careful review of the administrative record and the briefs on file, the Commissioner's decision is affirmed.

## STANDARD OF REVIEW

The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial

evidence means 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Under the statute, a claimant is unable to engage in any substantial gainful activity when she "is not only unable to do [her] previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled.  20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982).  In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity."  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(b).  At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c).  If not, the disability claim is denied.

At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1.  If the claimant's impairment meets or equals one of the listed impairments, she is conclusively presumed to be disabled.  If not, the evaluation proceeds to the fourth step, through which the Administrative Law Judge ("ALJ") assesses the claimant's residual functional capacity [1] ("RFC") and determines whether the impairments prevent the claimant from doing the work she has performed in the past.  If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e).  If she cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of her RFC, as well as her age, education, and work experience.  If the claimant cannot, then she is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving that she cannot return to her former employment because of the alleged disability.  *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991).  Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy that the claimant can perform.  *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989).  Additionally, to be eligible for disability benefits, the claimant must demonstrate that her disability existed prior to the expiration of his insured status, or her date last insured.  *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

---

[1] An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  20 C.F.R. § 404.1520(e) and 404.1545(a)(1).

## BACKGROUND

Rentas was born on August 27, 1964.  (Transcript ["Tr."] 28, 156).  She has a tenth grade education,[2] no vocational training, does not speak English, and worked packaging merchandise at a clothes warehouse (unskilled to semi-skilled work which required medium to heavy exertion) from 1994[3] to November 5, 2002.  (Tr. 18, 30, 65, 89, 91, 95-97, 106, 156, 188, 208, 347-353).  She claims to have been disabled since November 5, 2002 (alleged onset date) at 38 years of age[4] because she injured her back at work lifting a box.  (Tr. 93, 106).  She last met the Social Security Administration's ("SSA") insured status requirements on December 31, 2007 (date last insured).  (Tr. 15, 169, 341, 598).  She did not engage in substantial gainful activity during this period.  (Tr. 17).

### Procedural History

Rentas applied twice for a period of disability and disability insurance benefits.  Her first application filed on October 2003 was denied by an ALJ in May 2006 (Tr. 98-110), and affirmed by the Appeals Council on October 26, 2006.  (Tr. 15).  She filed her second application on February 20, 2007 (Tr. 154-160), and the ALJ only considered the unadjudicated period from May 27, 2006 to the date last insured because Rentas did not offer new evidence for review for the period ending on May 26, 2006, making that first hearing decision final and binding.  (Tr. 15).  The ALJ also denied benefits on February 22, 2010 (Tr. 9-23), and the Appeals Council affirmed on September 8, 2011.  (Tr. 1-8).  Rentas filed a complaint in this court and the

---

[2] The ALJ wrote in the 2010 hearing decision that Rentas has an eleventh grade education (Tr. 18) but Rentas's testimony at the hearing plus treatment records and disability determination notices show that her highest level of education was the tenth grade.  (Tr. 30, 89, 91, 95-97).

[3] A disability report states Rentas began working in 1992 (Tr. 188) but she reported in a work history report that she started working in 1994.  (Tr. 65, 208).

[4] Rentas was considered to be a younger individual (Tr. 106), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work."  20 C.F.R. 404.1563(c).

Commissioner's request to remand the case for further proceedings was granted.  *See* cv. 11-2054 (SCC). (Tr. 441-444).  The Appeals Council in turn referred the matter back to the ALJ. (Tr. 445-450).  Another hearing was held on September 6, 2013. (Tr. 361-400).  The ALJ determined on November 26, 2013 that Rentas was not disabled during the relevant period, from November 5, 2002 to December 31, 2007. (Tr. 332-360).

***First Application***

Rentas first applied for a period of disability and disability insurance benefits on October 1, 2003 after injuring her back at work on October 4, 2002.  (Tr. 100, 439).  The record contains no progress notes for the time period contained in the first disability application.

Rentas had already being receiving treatment (physical therapy and medications) under the auspices of the State Insurance Fund ("SIF") from October 11, 2002 to January 7, 2003 for herniated nucleus pulposus of L5-S1 discs and a related lumbosacral muscle spasm.[5] (Tr. 439, 644).  An MRI of the lumbosacral spine in November 2002 showed a large herniated disk centrally located at the L5-S1 level with minimal indentation of the thecal sac.  There was no evidence of canal stenosis, narrowing of the neural foramina, or hypertrophy of the ligamentum flavum.  All other vertebral bodies were normal in height and bone marrow signal intensity. (Tr. 343, 440, 645).

Rentas reported that she also sought medications when necessary for her back conditions and high blood pressure at the Centro IPA-633 medical group and at the Loiza Integrated Health Council.  She reported being given Flexeril and Naproxin for her muscular pain (which caused

---

[5] The record does not contain progress notes, surgery recommendations, or an RFC assessment while she was being treated at the SIF, only the MRI results and a one-page medical certificate from the SIF that indicates the time period she was under treatment, the diagnosis, the treatment plan, and that she received a "Definite Discharge with disability" on January 7, 2003.  (Tr. 439, 644).

her drowsiness) and Atenolol for her high blood pressure (which caused no side effects).  (Tr. 189-191, 387).

Rentas also reported being treated for depression through APS Healthcare ("APS"), starting in 2003, [6] and that she was prescribed Prozac and Flurazepam, which caused her sleepiness and nausea.  (Tr. 189-191).

The Disability Determination Services ("DDS") referred the case to Dr. Trevor Grant, neurologist, for a consultative evaluation of Rentas's motor system.  On December 8, 2003, Dr. Grant observed that Rentas was alert, oriented, cooperative, and had good memory.  Rentas informed him that her lower back pain worsened when she bent or sat for a long time, and that it radiated to her inguinal region.  She rated her pain 8 on a scale of 10.

Dr. Grant found that Rentas had muscle tenderness in the cervical and lumbar paravertebral area with minimal spasm of the latter.  The muscle strength in both her hip-flexors and right ankle-dorsiflexors was 4/5.  She had positive straight leg raising signs at 45 degrees bilaterally.  Her station was normal, but her gait was antalgic, favoring the right leg.  Dr. Grant found that Rentas had a cervical sprain, chronic lumbar sprain, right L5 radiculopathy, and obesity, with a poor prognosis.  He assessed that she was impaired to walk and lift, but could perform both activities even with a poor prognosis.  Dr. Grant did not specify the degree of limitation regarding walking or lifting.  He found no other limitations and further found that Rentas was neurologically intact.  (Tr. 314-315).

The case was also referred to Dr. Carmen L. Martinez Cotto for a consultative psychiatric evaluation.  (Tr. 91-94, 316-319).  On January 13, 2004, Rentas told Dr. Martinez that she was depressed because she was not able to return to work after receiving treatment at the SIF and that

---

[6] Rentas received mental health treatment from 2003 to 2013, but not on a regular basis.  (Tr. 231, 321-322, 345).

she was the only financial support at her home.  She had previously suffered a depressive crisis because of marital problems (her husband, from whom she was separated, had a drug problem), and was treated and diagnosed for panic attacks.  She also claimed to suffer from insomnia, sadness, crying spells, anhedonia, anxiety, self-deprecatory feelings, poor self-esteem, and weight gain.  (Tr. 93).

As to her activities of daily living, Rentas told Dr. Martinez that she lived with her two children in a house behind her parents' home.  She did light chores at home with her mother's help and read the Bible.  She would always go out accompanied.  As to social functioning, she would sometimes go shopping and went regularly to church four days a week, but did not participate in any other community or social activities.  Her relationship with her neighbors was good.  She stated that she was able to make simple decisions but was not able to complete tasks without interruption.  She handled tension and pressures of daily living by trying not to get angry and seeking God's help.  (Tr. 92, 317).

Dr. Martinez found that Rentas's immediate memory was poor (she could not do the digits test correctly), her short term memory was poor (she remembered one of five words after five minutes), her recent memory was fair (she remembered some events and not others), and her remote memory was good (she remembered pertinent remote events).  Rentas's attention span and concentration were diminished.  She could not sustain attention and became distracted.  She was able to recite the months of the year backwards but could not subtract in series of three.  Her response time was slow.  Her judgment was diminished due to personal and social events (her spouse's drug abuse and bereavement because of her mother's death).  She showed poor tolerance to stress.  Her insight was fair.  (Tr. 94, 319).

Dr. Martinez diagnosed moderate major depression, recurrent, and concluded that her prognosis was poor at the time.  She found that Rentas was physically and mentally affected and needed medical-psychiatric treatment.  Dr. Martinez did not expect remission of symptoms during the next few months of her evaluation, and concluded that Rentas could not return to work due to her physical and emotional conditions.  (Tr. 94).

The claim was initially denied on January 27, 2004, and upon reconsideration on April 20, 2004.  At Rentas's request, a hearing before an ALJ was held on February 22, 2006.  (Tr. 100).[7]  At the hearing, Rentas testified that due to her work-related back injury, she was unable to stand or sit for long because of herniated discs.  She felt numbness or a tingling sensation in her hands and legs, and spasms and tenderness in her muscles.  As to activities of daily living, Rentas testified that her mother helped her with everything until she passed away.   She then lived with her sister, husband, and her ten-year old son.  Rentas was able to wash dishes, take out the trash if it was not too heavy, and go to church every Sunday.  She would visit a sister at her house, go shopping once a month, and had been to her son's school activity about five or six months prior.   She received treatment for nervousness after she stopped working and because of her mother's death, and the medications made her sleepy.   (Tr. 100).

A vocational expert ("VE") testified that although Rentas would not be able to perform past relevant work because it required medium to heavy exertion, there were other jobs in the national economy that she could perform, such as classifier of models/colors, thread pinner, and shoe pairer. (Tr. 100).

On May 26, 2006, the ALJ issued a decision finding that Rentas was not disabled under sections 216(i) and 223(d) of the Act.  (Tr. 98-110).

---

[7] The record does not contain a transcript of this hearing.  This portion of the facts was obtained from the ALJ's hearing decision.  (Tr. 100).

### Second Application

Rentas filed a second application for disability insurance benefits on February 20, 2007.[8] (Tr. 154-160).  The record contains evidence of physical exams, but it does not contain treatment or progress notes for physical conditions for the period after May 26, 2006.

In a disability report dated February 22, 2007, a field office interviewer noted that Rentas was cooperative and coherent during the telephone interview and displayed no difficulty hearing, reading, talking, concentrating, understanding, and answering.  The interviewer considered that DDS capability development was not needed.  (Tr. 183-185).

Rentas also prepared a disability report, in which she stated that her back conditions, high blood pressure, and depression limited her ability to work because she could not stand or sit for long periods of time due to severe pain in her back, legs, lower back, and shoulders.  She had worked after her onset date but stopped working after the treating physician at the SIF recommended that she stop working because she could not stand for long periods of time.  (Tr. 186-193).

Rentas reported in her function report regarding her activities of daily living that she took care of her personal hygiene and that her conditions did not affect her ability to bathe, take care of her hair, use the toilet, or shave.  She had difficulty getting dressed because she had problems moving her hands and it hurt to bend down to put her shoes on.  She took her medications and kept her medical appointments.  She added that she needed help remembering to take care of her personal needs and to take her medications.  She also watched television and read the Bible.  She could do house and yard work for only a few minutes because she could hurt herself if she did more.  Her sister helped her perform some daily tasks.  Rentas could prepare light meals, but her

---

[8] Rentas's second application states that no previous application had been filed with the SSA. (Tr. 156).

sister cooked because she could not stand for long periods of time.  Rentas drove to her appointments but did not go alone. While grocery shopping with her sister once a month, she had to sit down sometimes because of her condition.  She did not socialize but did not have problems getting along with other persons, and went to church when her condition allowed.  As to money management, she could pay bills and count change, but had difficulty handling a savings or checking account.  (Tr. 51-61, 197-204).

As to her physical and mental abilities, Rentas claimed that her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, use her hands, remember, and concentrate.  She could walk one block before needing to stop and rest, and needed 15 to 20 minutes before resuming walking.  She further claimed that she could not pay attention for long, or finish what she started (such as chores or a conversation or reading or watching a movie), could not concentrate enough to follow written instructions because her nerves were impaired, and had difficulty following verbal instructions.  Her ability to talk, hear, understand, or get along with others was not affected, and she had no problem getting along with authority figures. She handled stress by praying, taking medications, and talking to her sister, and handled changes in routine by resigning herself to her condition and staying home.  (Tr. 59-60).

The record contains various radiology examinations for this time period.  A lower back x-ray report dated June 28, 2007 revealed a paraspinal muscle spasm with discogenic disease between the L5-S1 intervertebral spaces, straightening of the normal lordosis related to the muscle spasm, and bilateral degenerative joint disease changes of both sacroiliac joints.  (Tr. 257, 343).  Another lumbar spine examination performed on July 7, 2008, also revealed muscle spasm, degenerative changes, discogenic disease, and straightening of the lumbar lordosis.  The

vertebral bodies were well aligned, but there was intervertebral disk space narrowing at the L4-L5 and L5-S1 levels.  (Tr. 307, 311).

APS progress notes from one appointment in 2007 show that Rentas was diagnosed with major depression.  She was receiving pharmacotherapy and her progress was stable.  She had arrived alone to the appointment and appeared groomed.  She was alert and her mood calm.  Her thought process was logical, coherent, relevant, and oriented.  Her affect, insight, and judgment were adequate.  She had no hallucinations or was a suicide or homicide risk.  (Tr. 321-322).

The DDS referred the case to Dr. Jeanette Maldonado for a consultative psychiatric evaluation and mental RFC assessment for the time period of January 22, 2004 to May 15, 2007. On June 11, 2007, Dr. Maldonado reported that Rentas suffered from a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, feelings of guilt or worthlessness, and difficulty concentrating or thinking.  Rentas also had anxiety, poor short and immediate memory, and poor judgment.  Dr. Maldonado assessed that Rentas was able to understand, remember, and perform simple tasks within the weekly demands of pace, but could not perform complex tasks.  She could concentrate for more than two hours and sustain the tasks effectively.  She could also tolerate routine supervision, make work-related decisions, and interact with peers in an acceptable manner.  (Tr. 237-256).

The claim was initially denied on July 20, 2007.  (Tr. 47-49, 95, 113-115).  Rentas requested reconsideration and filed a disability report on appeal, dated August 28, 2007.  (Tr. 217-225).  She reported that she had no new illnesses since her last disability report but claimed that her conditions (herniated discs, carpal tunnel syndrome, leg numbness, high blood pressure, dizzy spells) had worsened and that she had developed new limitations as a result of her existing conditions (could not stand or sit for long periods of time or in one position and had difficulty

sleeping and taking care of her personal needs because of her herniated discs). (Tr. 221, 223). However, she offered no additional medical evidence to support her claim. (Tr. 218).

At some point in 2007, Rentas moved to Florida. (Tr. 284). At a medical check-up performed on March 5, 2008 at the Apopka Community Health Center in Florida, the medical staff noted lower back tenderness and spasm. Other results were normal. (Tr. 258).

The case was referred for a physical RFC assessment. (Tr. 261-268). Dr. Loc Kim Le assessed on June 18, 2008 that Rentas could perform light work. She could occasionally lift and/or carry up to twenty pounds, frequently lift and/or carry up to ten pounds, stand and/or walk (with normal breaks) for about six hours in an eight-hour workday, sit (with normal breaks) for about six hours in an eight-hour workday, and unlimitedly push/pull (including operation of hand and/or foot controls). She could frequently climb, balance, kneel and crawl, and occasionally stoop and crouch. She had no manipulative, visual, communicative, or environmental limitations. Dr. Le found no other statement regarding Rentas's physical capacities in the record. (Tr. 262-267).

The DDS also referred the case to Dr. Ada Ramirez, a Florida licensed psychologist, for a general clinical evaluation with mental status examination for Rentas's complaints of depression. Dr. Ramirez interviewed Rentas on August 9, 2008, and observed that Rentas was alert and oriented to the four spheres (person, place, time, and situation), her concentration and attention were adequate, her thought process appeared logical and coherent, her judgment and insight appeared to be fair, and her speech was lucid and goal-directed. She denied having suicidal thoughts, plans, or intent. Rentas performed well in various exams given to her, such as reciting the alphabet at a regular space and spelling a word forwards and backwards. She was able to correctly perform some math exercises, but not others. Dr. Ramirez further found that her fund

of knowledge appeared to be generally intact (Rentas was able to name three Puerto Rican governors and three of the largest Puerto Rican towns), with adequate short-term memory (Rentas identified three out of three words five minutes after they were presented to her), and good long-term memory (she provided her background information and daily functioning activities without difficulty).  (Tr. 269-271).

Rentas reported she was able to take care of her daily hygiene needs and that she did not drive because she did not have a valid Florida driver's license.  Her daughter-in-law would take her to appointments and to run errands.  On an average day, she would stay home and read the Bible or watch television.  She helped with some light household chores such as washing dishes and folding clothes.  She did not have a social life but went to church twice a week.  (Tr. 270).

Dr. Ramirez found that Rentas's mood was depressed, her affect was consistent with her mood, and diagnosed depressive disorder NOS, with a Global Assessment of Functioning ("GAF")[9] of 60.  Rentas was able to manage funds.  Dr. Ramirez found no evidence of a thought disorder or of any other psychotic process.  (Tr. 270-271).

Dr. Leigh Rosenberg, a state agency non-examining source opinion, prepared a Psychiatric Review Technique Form ("PRTF") and a mental RFC assessment on August 18, 2008.  Dr. Rosenberg assessed that Rentas was able to understand and carry out at least simple tasks and directions and complete tasks within her objectively defined physical limits.  Dr. Rosenberg noted that there was credible evidence that Rentas's functional limitations were attributable to medical-pain factors as opposed to mental factors and that there would likely be

---

[9] GAF is a scale from 0 to 100 used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults.  A GAF score between 51 and 60 indicates "moderate symptoms" or "moderate difficulty in social occupational, or school functioning." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) (DSM–IV–TR).

moderate problems with concentration and attention due to her reports of pain interference in daily function.  Rentas could generally get along well enough with people for routine daily needs.  Dr. Rosenberg concluded that, overall, while there were some mental deficits secondary to medical-pain issues, Rentas would not be impeded from independent daily functioning and working at routine work tasks within her objectively defined capacities.  (Tr. 272-289).

The claim was denied upon reconsideration on August 18, 2008.  (Tr. 15, 96, 118-123).  Rentas filed another disability report on January 12, 2009.  She again claimed that her conditions had worsened, that she had developed new limitations as a result of her conditions, and that it was difficult for her to be on foot, walk, bend over, bathe, dress, comb her hair, and do any strenuous work.  She also claimed to have developed new conditions (degenerative changes, discogenic disease, muscles spasms).  Rentas offered no additional medical evidence.  (Tr. 227-235).

The record contains evidence of mental health treatment for major depressive affective disorder through APS from December 3, 2008 to October 27, 2009.  Rentas went alone to her appointments during this time period, and observations from the staff indicate that she looked neat, held eye contact, and was calm, cooperative, alert, logical, coherent, relevant, and oriented, and held eye contact.  Her affect, insight, judgment, sleep, appetite, and libido were adequate.  She denied having delusions or hallucinations and was not a suicidal or homidical risk.  She had no psychiatric hospitalization, no suicidal attempts or family history of suicide, or history of controlled substance use, and had one aunt with mental illness (depression).  (Tr. 73-90, 290-306).

On December 3, 2008, Rentas reported that she continued to be sad, having self-deprecatory feelings and poor self-esteem, was irritable, anxious, restless, with loss of appetite

due to her physical conditions (hip, back, neck), and no psychomotor agitation.  The record states

that she had not attended treatment for around a year prior because she had moved to the

mainland.  Progress notes from January 28, February 25, and April 22, 2009 show that the

treating physician found her progress to be stable.  She was first prescribed Prozac and Dalmane,

and then switched to Prozac and Restril.  On April 22, Rentas acknowledged that she did not

keep her medical appointments. (Tr. 80-88, 297-304).   On June 23, Rentas reported feeling

anxiety, restlessness, irritability, somatic complaints (pain in neck, legs, arms, discomfort), self-

deprecatory feelings, lack of concentration, and loss of appetite.  The treating physician found

that she was not improving.  APS progress notes from October 9 show that Rentas was stable but

had not had treatment in weeks, and was advised that she needed continuity in treatment.  (Tr.

76, 293).

In 2009, Rentas was treated by Dr. Ivette Colon Reyes for back problems.  An x-ray of

the cervical spine dated October 29 showed cervical spondylosis with narrowing of C5-C6

intervertebral disc space suggestive of intervertebral disc disease at the C5-C6 level.  (Tr. 308,

403).  On November 11, a lumbosacral spine MRI showed right paracentral intervertebral disc

herniation at the L5-S1 level.  (Tr. 312).  An x-ray dated November 23 suggested degeneration of

lumbar disc and intervertebral disc disorder with myelopathy in the cervical region.  At the time

of the examination, she was alert, active, and oriented, and complained of cervical pain radiating

to her arms and lower back pain radiating to her legs, with associated numbness.  (Tr. 309-310).

Dr. Colon prepared a medical certification (undated) in which she summarized Rentas's

cervical and lower back pain complaints, medical evidence as of 2009, past treatment (physical

therapies, oral treatment of Toradol, Flexeril, Relafen, Napoxen, Indocin and Ultram without

clinical improvement), and a medical assessment of degeneration of lumbar disc and

intervertebral disc disorder with myelopathy in the cervical region.  Dr. Colon concluded that Rentas was unable to work.  (Tr. 313).

Rentas requested a hearing before an ALJ (Tr. 124-126), which was held on January 11, 2010.  (Tr. 15, 127-151).  At the hearing, Rentas testified that she was unable to work because she felt severe, almost constant pain in the form of pinching in her cervical area and lower back, her hands would go numb, her legs bothered her, and she got a lot of cramps.  (Tr. 32-33). She suffered from back cervical pain, neck pain, hand numbness, high blood pressure, and thyroid problems. She was depressed, had memory problems and was unable to sleep.  (Tr. 18, 24-46).  She tried to work in spite of her conditions, but staff at the SIF told her that she was unable to work.  (Tr. 44-45).  She further testified that she was able to remain standing for about an hour, sit for about an hour, and walk for about an hour.  She could not bend forward at waist level, could make some neck movements, and was able to use her arms, hands, and fingers but with discomfort (numbness and cramps, and pain).  Her legs would swell, and she experienced loss of strength in her hands with some swelling.  She could not raise her arms above her shoulders.  She stopped driving when her back problems began.  (Tr. 30). Rentas testified that she was never hospitalized for her conditions.  (Tr. 36-37, 43).

She further testified that she also received mental health treatment through APS.  After she stopped working, she was unable to sleep and was given pills.  She was forgetful.  She used to get along with others, but not so after she stopped working because she would get sad.  She heard voices sometimes.  She once thought of hurting herself and wanting to die.  She testified that the medications prescribed at APS helped her a little.  The ALJ noted that there are no treatment notes for the period between 2006 and 2008.  (Tr. 37-42).

As to daily activities, Rentas testified that from 2002 to 2007, she spent her time at home but did not do household chores, go shopping, or visit neighbors or relatives.  Her sister would help with the household chores.  She would take care of her own personal hygiene.  (Tr. 42-43).

On February 22, 2010, the ALJ again found that Rentas was not disabled under sections 216(i) and 223(d) of the Act.  (Tr. 9-23).  On September 8, 2011, the Appeals Council denied Rentas's request for review of the ALJ's decision, and rendered the ALJ's decision the final decision of the Commissioner.  (Tr. 1-8, 152-153).

***Other Evidence After the ALJ's Second Determination***

An MRI of the cervical spine dated May 4, 2010, referred by Dr. Colon, showed a normal signal from the cervical spinal cord, with a decreased signal from the C5-C6 intervertebral disc. The impression was of central intervertebral disc herniation with cervical spondylosis producing spinal canal stenosis from C5-C6 level.  (Tr. 404).

Rentas further received physical/occupational therapy from October 18, 2012 to April 11, 2013.  (Tr. 405-411).  Dr. Gerardo Ortiz at EMS Physical Therapy treated Rentas for cervical and lower back pain, but his progress notes (dated October 18, 2012 and February 21 and 28, and April 11, 2013) and emergency room notes from the CDT Canovanas emergency room (dated January 29 and May 1, 2013) are illegible.  The record does show that Dr. Ortiz gave Rentas a steroid injection for her lower back pain on February 26, 2013.  (Tr. 405-408, 411-413, 416-423, 613-615).

Progress notes from a physical therapy session on November 28, 2012 with RS Therapy Group states that therapy began on October 26 with the objective of decreasing muscle spasms in the trapezius and dorsal/lumbar area, decrease pain, and increase strength and range of movement. She had eight visits and her progress was fair.  As of her last visit, she presented

limitation in the neck and moderate muscle spasms in the upper and middle trapezius.  She also presented moderate pain when performing lumbar and lateral flexion and trunk rotations. Rentas reported to the therapist that she continued to feel strong back pain but felt relief after therapy, and that the back pain would return as the day went by.  (Tr. 409, 617)

The record contains evidence of an emergency room visit on January 29, 2013, with discharge date of February 18 at the University of Puerto Rico Hospital for back pain and back spasm, but no notes are included.  (Tr. 402).

On June 4, 2013, an APS evaluation form shows that Rentas's main complaint was anxiety and sleeplessness.  She was alert, active, oriented, logical, coherent, relevant, cooperative, anxious, and depressed.  She was not suicidal or homicidal, and presented no delusions or perceptual disorders.  The psychiatrist found that her level of credibility regarding her statements was good.  Her diagnosis was changed to anxiety disorder, but her medications were not changed.  (Tr. 426-427).

*On Remand*

On February 26, 2013, this court granted the Commissioner's request to remand the case for further proceedings.  *See* cv. 11-2054 (SCC).  The Appeals Council requested that the ALJ further evaluate Rentas's medically determinable impairments and physical and mental RFCs as per 20 CFR 404.1545 and SSRs 85-16 and 96-8p, specifically address and evaluate the state agency medical consultants' opinions on the nature and severity of the claimant's mental impairments as per 20 CFR 404.1520, and if necessary obtain evidence from a vocational expert as per SSR 83-14.  (Tr. 339, 449-456, 474-481).

A hearing before the ALJ was held on September 6, 2013.  (Tr. 361-400, 484-495, 503-512).  Rentas, two medical experts ("ME"), Dr. Ramon Fortuño (psychiatrist), and Dr. Javier

Anaya (internist), and a VE, Dr. Hector Guerra (clinical psychologist), testified.  Both MEs were present during Rentas's testimony.  (Tr. 383, 497, 499, 501, 560, 567).

Rentas testified that she felt very strong, sometimes constant, pain in the cervical and lumbar area and in her arms and legs.  She could bend forward at the waist a little.  It bothered her to lift her arms over her shoulders.  Her hands would go numb and weak.  She added that she was not able to make neck movements between 2002 and 2007.  Her medications made her drowsy.

Rentas further testified that she could stand or sit for ten minutes before feeling pain, and walk for ten to fifteen minutes before having to sit and rest.  She could lift a liter of milk but not a gallon.  She could concentrate (such as follow a story on television) and remember simple tasks (such as receive and relay a message).  She took care of her personal hygiene, read the bible, went to church, and ran errands with her sister.  She got along well with people, could be in groups, talk with people, and behave adequately.  (Tr. 364-383).

Dr. Fortuño testified that the record contained little psychiatric evidence during the relevant period to show that she suffered a condition of an emotional nature that was a severe impediment for a period of twelve months or more.  He testified that the evidence showed that visits and treatment were spread out during the time period, that there was a lack of continuity of treatment, and that the record did not show an impairment that met or equaled the criteria of a listed impairment.  He further noted that a GAF of 60 is a condition not of great severity and that she remained on the same medication in low dosages throughout (Prozac in the morning and Restoril at night).  (Tr. 346, 384-386).

Dr. Anaya testified that the record lacked evidence (such as electromyography ("EMG") results) [10] of nerve numbness of the spinal canal, which would show greater suffering or symptoms, and suggested that the case be referred to a neurologist because the MRI results in evidence that show herniated discs alone did not provide evidence of stenosis in the canal or stretching of the neural foramen.  When asked to comment on findings contained in the record, Dr. Anaya testified that Rentas's lumbar condition was serious but not severe, and opined that Rentas could lift up to twenty pounds occasionally, up to ten pounds frequently, sit for four hours in an eight-hour workday, stoop/crouch/crawl occasionally, with no limitations with her hands or walking, and no communicative or environmental limitations.  (Tr. 344, 388-390).

Dr. Guerra received several hypothetical questions.  The first question assumed the functionality contained in Dr. Loc Kim Le's physical RFC assessment, and asked whether a person who can occasionally lift twenty pounds, frequently lift ten pounds, stand and walk for six hours, sit for six hours, with no limitation for pushing and pulling, frequently go up steps/ramps/scaffolds/ropes/moving cars, balance/kneel/drag herself, occasionally bend, with no visual/manipulative/communicative/environmental limitations could fulfill the physical demands of Rentas's past work.  The VE testified that such a person could not because the hypothetical question described activities at a light level and Rentas's past job was at a medium level.  (Tr. 393-394 ).

For the second hypothetical question, the ALJ used the functionality of the person described by Dr. Anaya and asked whether a person described in the first hypothetical, but that could sit for four hours instead of six could perform past relevant work.  The VE answered that she could not either because this question also had the person doing light work.  (Tr. 394).

---

[10] Rentas testified that she had an EMG or needle test performed while being treated through the SIF, but that she did not have copies of the test results.  (Tr. 383).

The VE further testified that there were alternative light jobs in the national economy that such a person could perform with the limitations described in both hypothetical questions, such as assembler of electrical accessories, electronics worker, and ampule fitter.  (Tr. 395-396).

The ALJ then told the VE that the claimant experienced strong pain in the cervical area and in her legs, and asked if a person with such pain, which adversely affected attention, concentration, and rhythm of work, added to the limitations contained in the hypothetical questions, could fulfill the demands of past relevant work.  The VE answered that she could not perform those jobs or any other job in a sustained way because the pain would interfere with concentration and attention, and the absence of efficient attention and concentration ended with problems in maintaining the pace of production in manufacturing.

The ALJ further asked whether, as Dr. Fortuño testified, a person who could understand, remember and accomplish simple instructions, maintain attention and concentration for two hours or more, can get along with the public/co-workers/supervisors, and adequately adapt to changes in the work routine could fulfill the mental demands of past relevant work or the alternate jobs he mentioned.  The VE answered that she could because her mental state would not be compromised to the point that she could not function as expected.

The ALJ then asked whether, as assessed by Dr. Rosenberg, a person with the capacity to perform routine and simple tasks, that can relate with people and that can function independently on a daily basis, could work.  The VE answered affirmatively.  The ALJ added that Rentas claimed to have memory problems and difficulty understanding, remembering and accomplishing simple and complex instructions, and maintaining attention and concentration for longer than two hours in routine activities, and asked whether such a person would work.  The VE testified that such a person could not work in a sustained way.  Rentas's attorney added that

such a person takes a medication that made her drowsy, and the VE testified that such a person would have difficulty working in a sustained way.  (Tr. 396-398).

The ALJ determined on November 26, 2013 that Rentas was not disabled during the relevant period (from November 5, 2002 to December 31, 2007) (Tr. 332-360).  The ALJ found that Rentas:

(1) had not engaged in substantial gainful activity since the alleged onset date until her date last insured (Tr. 341);

(2) had the following severe impairments: degenerative changes and disc disease of the lumbar spine, disc herniation L5-S1, cervical spondylosis, degenerative changes of the sacroiliac joints, and depressive disorder NOS (Tr. 341);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526 (Tr. 343);

(4) could not perform past relevant work (Tr. 353) but retained the RFC to perform light work (lift/carry twenty pounds occasionally and ten pounds frequently, stand/walk for six hours in an eight-hour workday, sit for four hours in an eight-hour workday, occasionally climb/stoop/crouch/crawl but never stoop/climb, and no limitations for pushing/pulling with the upper and lower extremities other than the limitations for lifting/carrying). Despite her depression, Rentas retained the capacity to understand, remember, and carry out simple job instructions and tasks, maintain attention and concentration for periods of two hours or more, interact with co-workers/supervisors, adapt to changes in routine work settings, and sustain an ordinary routine (Tr. 347-348); and

(5) could perform other jobs in the national economy as per her age, education, experience, RFC, and the vocational expert testimony, such as assembler I, electronics worker, and ampule filler, and therefore, was not disabled.  (Tr. 354).

As to the medical evidence that the ALJ considered, the ALJ noted that the record supported Rentas's allegations of disability due to back conditions, high blood pressure, and depression, and that some of her alleged impairments resulted in more than a minimal effect on her ability to perform basic work-related activities, and were thus considered severe impairments as per 20 CFR §§404.1520(c) and 404.1529(d)(1), and SSR 96-3p.  (Tr. 341).

The ALJ further noted that Dr. Grant only reported an unspecified limitation for walking and lifting.  Regarding Dr. Martinez's finding that Rentas was obese, the ALJ found that the record did not contain evidence that showed that her weight limited her RFC.  (Tr. 342).  The ALJ further noted that the record contained evidence from after Rentas's date last insured, such as diagnosis for lumbar intervertebral disc disorder with myelopathy at the cervical region and hypertension, but that these were not supported by clinical findings as to severity and appeared to be controlled, and the evidence did not contain RFC assessments, neurological evaluations or reveal end-organ damage as a result of her existing conditions during the relevant time period. The ALJ further added that even assuming the severity of hypertension, a finding that Rentas could perform light work would still hold.  (Tr. 342).

The ALJ gave significant weight to Dr. Grant's findings and to Dr. Loc Kim Le's physical RFC assessment but concluded that Rentas's ability to stand and walk was more limited than the assessed six hours in an eight-hour workday as assessed by Dr. Anaya, to whom significant weight was given as well.  (Tr. 343-344, 352). The ALJ deferred to the opinions by the DDS medical consultants because they evaluated the evidence through the date last insured and their

opinions were consistent with Dr. Anaya's.  (Tr. 352).  The ALJ gave no weight to Dr. Ivette

Colon's medical certificate because it did not contain specific findings to support her conclusion

that Rentas was unable to work.  (Tr. 344).

As to psychiatric evidence, the ALJ gave significant weight to Dr. Fortuño and to Dr.

Maldonado and deferred to the assessments by the DDS consultant.  Little weight was given to

Dr. Martinez because it was not consistent with her own diagnosis and to Dr. Colon because the

medical certificate had no date and contained no references of when Rentas was evaluated.  (Tr.

346, 353).  The ALJ found that Rentas's depression as reported by APS was non-severe and she

retained the capacity to understand, remember, and carry out simple instructions and tasks.  (Tr.

345). The ALJ further found that evidence was scarce for the relevant period, that there was no

evidence from 2002-2004, and that treatment with APS began on February 15, 2007.  (Tr. 344).

The ALJ found that Dr. Carmen Martinez Cotto's consultative assessment of moderate major

depression was not supported by other evidence in the record that corroborated severity for a

continuous period of at least 12 consecutive months.  (Tr. 345).

As to her pain allegations, based on the requirements of 20 CFR 404.1529 and SSR 96-

7p, the ALJ found that Rentas's determinable impairments could reasonably be expected to cause

the alleged symptoms but that her statements concerning intensity, persistence or functionally

limiting effects of pain or other symptoms were not entirely credible based on the evidence

contained in the record and her own statements regarding her ability to perform light house

chores and other activities such as watch television and read.   All other pain allegations made

after her date last insured were not considered relevant in determining disability.  The ALJ

further added that her allegations regarding depression were considered but the record and her

own statements supported her ability to perform simple tasks, interact with others, adapt to changes, and sustain an ordinary routine.  (Tr. 350-352).

Rentas appealed the decision, claiming that the ALJ did not give credibility to all of Dr. Grant's opinion (who found that she could walk and lift in spite of her limitations in those two activities but did not specify the extent of her limitations) and did not consider Dr. Rosenberg's opinion that Rentas was limited to performing simple tasks, and that Dr. Fortuño did not consider Dr. Rosenberg's or Dr. Martinez's opinions.  (Tr. 328-331).

On April 16, 2015, the Appeals Council notified Rentas that it reviewed the written record, the hearing testimonies of the two medical experts and the vocational experts, and her appeal letter.  It found that the hypothetical questions posed to the VE included the ability to perform simple tasks, that the ALJ addressed her testimony regarding pain in her cervical and lumbar regions and in her arms and legs as a significant non-exertional impairment in addition to her medically established condition, that the ALJ considered Rentas's testimony regarding her ability to stand for 10 to 15 minutes but was not able to lift a gallon of milk because of hand weakness, that she has received conservative treatment (physical therapy and medications) with no evidence of side effects in the treatment notes except for her testimony that the medications made her drowsy but has not required narcotic medication or the use of a TENS unit to control pain, and that the ALJ found that Rentas had the RFC to understand, remember, and carry out simple job instructions and tasks.   The Appeals Council affirmed the ALJ's decision as the final decision of the Commissioner after remand by the district court.  (Tr. 323-327).   The present complaint followed.  (Docket No. 1).

## DISCUSSION

The court must determine whether there is substantial evidence to support the ALJ's determination at step five in the sequential evaluation process contained in 20 C.F.R. § 404.1520, that based on Rentas's age, education, work experience, and RFC, there was work in the national economy that she could perform, thus rendering her not disabled within the meaning of the Act. I will focus my analysis on the third hearing decision contained in the record, dated November 26, 2013. (Tr. 332-360).

Rentas argues that the ALJ failed to conclude that she had a severe impairment that significantly limited her ability to work on a sustained basis on or before her date last insured (Pltf. Memo. 14-16). A severe impairment is defined as an impairment that significantly limits the ability to perform basic work activities. 20 C.F.R. § 404.1521. The ALJ indeed found at step two that Rentas had severe impairments (degenerative changes and disc disease of the lumbar spine, disc herniation L5-S1, cervical spondylosis, degenerative changes of the sacroiliac joints, and depressive disorder NOS) which, by definition, limited her ability to work because "they resulted in more than a minimal effect on her ability to perform basic work-related activities." (Tr. 341).

Rentas next argues that the ALJ failed to find at step three that her medically determinable impairments meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Pltf. Memo. p. 3). Under step three of the sequential evaluation process, a finding that the claimant suffers from one of the listed impairments in the social security regulations results in an automatic finding of disability. *See* 20 C.F.R. § 416.920(d). However, the claimant has the burden of producing evidence that she satisfies the criteria for a particular "listed" condition. *Hernandez v. Comm'r of Soc. Sec.*, 989 F. Supp. 2d 202, 208 (D.P.R. 2013) (*citing Mills v. Apfel*, 244 F.3d 1, 6 (1st Cir. 2001)). I note that Rentas,

who has the burden at step three, has failed to point to a specific listed impairment that she claims is equivalent to her severe impairments.  The Commissioner then has final responsibility for determining whether the claimant has a listed impairment.  The Commissioner and her delegates consider both medical sources and non-treating source opinions on whether a claimant's condition equals a listed impairment. 20 C.F.R. §§ 404.1527(d)(2) & (e)(2).

At step three, the ALJ compared the evidence from both treating and non-treating physicians regarding her physical and mental impairments with the signs and symptoms of impairments listed under sections 1.00, 11.00, and 12.04 of the Listing of Impairments (20 C.F.R. § 404, Subpt. P, App. 1.), and found that Rentas's impairments did not meet or medically equal any of the impairments listed in those sections, or in any other section. (Tr. 344, 346).

Specifically, the ALJ noted plaintiff's physical impairments did not meet the criteria of listing sections 1.00 (Musculoskeletal System Listing) and 11.00 (Neurological Listing) or any other section found in the Listing of Impairments.  (Tr. 344).  Section 1.00(B)(2)(b) of the Musculoskeletal Listing directs the ALJ to review a claimant's ability to ambulate effectively[11] or perform fine and gross movements effectively on a sustained basis.  Section 11.00 contains a list of specific neurological impairments, each with directives as to how the ALJ should assess each neurological impairment.  20 C.F.R. § 404, Subpt. P, App. 1.  The ALJ considered evidence of Rentas's lumbar condition, including x-rays taken while under treatment at the SIF, and Dr. Colon's opinion as treating physician, a consultative evaluation from Dr. Grant, Dr. Loc Kim Le's assessment, and Dr. Anaya's testimony that Rentas's conditions did not meet or medically equal the criteria of an impairment found in the Listing of Impairments.  The record supports the

---

[11] Section 1.00(B)(2)(b) states that "[t]o ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living."  20 C.F.R. § 404, Subpt. P, App. 1.

ALJ's finding that Rentas was neurologically normal as reported by Dr. Grant,[12] that she could ambulate, although with some limitations, and that these limitations were not contained in any of the listed impairments under Sections 1.00 and 11.00.  Even Dr. Grant's evaluation, who assessed that she was impaired to walk and lift, also concluded that she could perform both activities even with a poor prognosis.  The ALJ gave no weight to Dr. Colon's assessment and, as the ALJ stated, the record for that medical source contains Rentas's complaint of cervical pain radiating to her arms and lower back pain radiating to her legs and associated with numbness, and a medical certification that Rentas was unable to work, but it does not contain findings of neurological or motion impairments to support such a conclusion.  Dr. Loc Kim Le assessed that Rentas could stand/walk (with normal breaks) for about six hours in an eight-hour workday, and the ALJ found that she was further limited in her ability to walk but gave this assessment significant weight.  I further note that in 2007 Rentas reported that even with her limitations to walk, she could walk one block before needing to stop and rest, and needed 15 to 20 minutes before resuming walking.  She also informed Dr. Grant that her lower back pain worsened when she bent or sat for a long time.  These statements were made during the relevant period.  In 2010, she testified that she was able to remain standing for about an hour, sit for about an hour, and walk for about an hour.  In 2013, she testified that she could walk for ten to fifteen minutes before having to sit and rest.

The ALJ further noted that Rentas's mental impairment did not meet the criteria of listing Section 12.04.  (Tr. 346).  To satisfy the requirements of Section 12.04, Rentas had to demonstrate that she had at least two of the following restrictions: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in

---

[12] I note that in 2004 Rentas also testified that she felt numbness or a tingling sensation in her hand and legs, but Dr. Grant's neurological finding rebuts that testimony.

maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  20 C.F.R. § 404, Subpt. P, App. 1.  The ALJ found that Rentas exhibited mild restrictions in daily living; mild limitations in social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (Tr. 346-347).  The record supports this finding based on Rentas's own function report filings and testimony before the ALJ and information she provided to the consultative physicians Dr. Grant, Dr. Martinez, Dr. Maldonado, and Dr. Ramirez (she reported being able to understand, concentrate and remember simple tasks, make simple decisions, perform light routine household chores, take care of her personal needs, run errands, go to church regularly, maintain a good relationship with her neighbors, get along with authority figures, and handle stress and pressures of daily living by praying), and Dr. Maldonado's 2007 consultative assessment opinion (Rentas could understand, remember and perform simple tasks within the weekly demands of pace; concentrate for more than two hours; sustain the tasks effectively; tolerate routine supervision; make work-related decisions; and interact with peers in an acceptable manner), which the ALJ deferred to.  I also note that Dr. Grant observed in 2003 while performing a consultative evaluation of Rentas's motor system that Rentas was alert, oriented, cooperative, and had good memory.  Dr. Ramirez, who performed a consultative mental assessment in 2008, also observed that Rentas was alert and oriented, and found that Rentas's concentration, attention, and short-term memory were adequate while her long-term memory was good, her thought process was logical and coherent, her judgment and insight appeared to be fair, and her speech was lucid and goal-oriented.  The record also supports the ALJ's finding that Dr. Martinez's 2004 consultative evaluation was inconsistent with the rest of the record in terms of the severity of Rentas's mental condition in that she opined that Rentas could not work due to her physical and emotion conditions.  However, Rentas's statements to Dr. Martinez further support the ALJ's mental restrictions determination.   The record shows that Rentas experienced no episodes of decompensation.

Regarding the ALJ's RFC determination, Rentas argues that the ALJ failed to grant credibility to her treating doctors (that the ALJ should have given greater weight to the treating physicians' opinions) and relied instead on Dr. Anaya's defective testimony (she claims it was defective because he lacked information to give an opinion).  Rentas further claims that the ALJ erred in concluding that the intensity and persistence of her subjective complaints were not supported by the record and that the ALJ did not consider any of the following factors when evaluating her subjective complaints: (1) nature, location, onset, duration, frequency, radiation and intensity of pain, (2) precipitating and aggravating factors such as movement, activity, and environmental conditions, (3) type, dosage, effectiveness, and adverse side effects of pain medications, (4) treatment for relief of pain, (5) functional restrictions, and (6) her daily activities, as per SSR 96-7p,[13] POMS 24515.060, and *Avery v. Secretary*, 797 F.2d 19 (1986), and therefore must find as per *Avery* that her pain complaints are credible and supported by the medical evidence.  (Pltf. Memo. p. 11-16).

The ALJ determined in 2013 that through the date last insured Rentas retained the RFC to perform light work because she could lift/carry twenty pounds occasionally and ten pounds frequently, stand/walk for six hours in an eight-hour workday, sit for four hours in an eight-hour workday, occasionally crouch/crawl but never stoop/climb, and had no limitations for pushing/pulling with the upper and lower extremities other than the limitations for lifting/carrying.  Despite her depression, Rentas retained the capacity to understand, remember, and carry out simple job instructions and tasks, maintain attention and concentration for periods of two hours or more, interact with co-workers/supervisors, adapt to changes in routine work settings, and sustain an ordinary routine.  (Tr. 347-348).

---

[13] Rentas cites SSR 95-5p, but this ruling was superseded by SSR 96-7p effective July 2, 1996.

SSR 96-7p directs the ALJ to consider a claimant's statements regarding pain in light of the entire record and to include specific credibility findings to corroborate or discredit a claimant's pain allegations.   1996 SSR LEXIS 4.   Here, the ALJ stated that based on the requirements of 20 CFR 404.1529 and SSR 96-7p, Rentas's determinable impairments could reasonably be expected to cause her alleged symptoms but that her statements concerning intensity, persistence, or functionally limiting effects of pain were not entirely credible based on the record.  (Tr. 350-352).

After reviewing the record, I find that it supports the ALJ's RFC findings.  The record shows that ever since her work injury in 2002, Rentas was continuously being tested by different treating sources for her lower back conditions and given therapy and/or pain medications.  As discussed under the step three analysis, treating and consultative physicians found and she acknowledged that she was able to walk to a limited degree and perform light tasks, such as household chores and personal hygiene routines that did not involve stooping.  She inconsistently received mental health treatment, which she acknowledged she did not follow through with, but in spite of that she remained under the same pharmacotherapy regime throughout her periods of treatment.   Treating, consultative, and self-reported records show that she was consistently stable, alert, calm, cooperative and concentrated enough to perform simple tasks, interact with other people, and sustain an ordinary routine.   I find that the ALJ took into account all the *Avery* factors as discussed in the step three analysis discussed above.

As to the weight of the evidence, the ALJ should give "*more* weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)."   20 C.F.R. § 404.1527(d)(2).   In addition, controlling weight must be given to a medical treating

source's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record.  20 C.F.R. § 404.1527(d)(2); SSR 96-2p.   Also, under the "good reasons" requirement, "the notice of determination must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p.  As discussed under the step three analysis, the ALJ thoroughly discussed why each source received the weight given.

With regards to Dr. Anaya, he suggested that evidence of nerve numbness of the spinal canal, such as in the form of EMG results, would better provide insight into Rentas's physical conditions.  The ALJ then asked him to opine based on the evidence in the record.  I gather that this statement is the reason why Rentas claims that Dr. Anaya's testimony was based on incomplete evidence, but during that same hearing Rentas testified that she had EMG results from the time she was treated at the SIF which were not included in the record, and I can only conclude that she had years to provide this evidence to the SSA, that is, the whole length of the administrative proceedings, and failed to do so.

The function of weighing evidence and determining if a person meets the statutory definition of disability is the Secretary's, 20 C.F.R. § 404.1527(d), and, as discussed in this opinion, there is substantial evidence in the record to support the ALJ's final determination.  The ALJ was required to consider all of the evidence of record when weighing Rentas's subjective claims of pain, to resolve conflicts in the evidence, and draw reasonable conclusions from the record.  There is substantial evidence in the record to support the ALJ's final determination.

Rentas v. Commissioner of Social Security, Civil No. 15-1782 (BJM)                    33

## Conclusion

For the foregoing reasons, the Commissioner's decision is affirmed.  Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of September, 2016.


_S/Bruce J. McGiverin_
BRUCE J. MCGIVERIN
United States Magistrate Judge